**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>HIAM HMAIDAN,<br><br>Defendant. | Case No. 25 CR 214<br><br>Judge Mary M. Rowland |

## MEMORANDUM OPINION AND ORDER

Defendant Hiam Hmaidan moves for a new trial pursuant to Federal Rule of Criminal Procedure 33 and renews her previous motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. For the reasons stated below, these motions are denied. The Government moves for entry of a forfeiture order. That motion is granted.

## BACKGROUND

On April 21, 2025, a grand jury returned an indictment charging Hmaidan with one count of conspiracy to commit mail fraud in violation of 18 U.S.C. § 1349, and five counts of substantive mail fraud in violation of 18 U.S.C. § 1341. [1]. Hmaidan's jury trial began on May 6, 2026. [45]. During the trial, the government presented testimony from 12 witnesses and admitted more than 300 exhibits. [47] [49] [50] [54]. The relevant evidence for these motions is set forth below.

Hmaidan, an accountant, ran a tax preparation business that operated inside the Super Mall located on S. Pulaski Road in Chicago, Illinois. Gov't Exh. 1602.

Veronica Torres worked for Hmaidan. [47] Tr. 557:4-18. Hmaidan's brother, Adnan Hmaidan, also worked as a tax preparer at the Super Mall. Gov't Exh. 009-8.

In March 2020, Congress created the Pandemic Unemployment Assistance ("PUA") program. [47] Tr. 333:22-25 to 334:1-6. The PUA program provided federal financial relief to self-employed workers who lost their jobs due to the pandemic but were ineligible for traditional unemployment insurance. *Id.* at 334:11-22. In Illinois, the PUA program was administered by the Illinois Department of Employment Security ("IDES").

On May 11, 2020, the day the PUA program became available to Illinois workers, Hmaidan submitted a PUA claim in her own name, stating that she was an independent contractor who was unemployed because of the COVID-19 pandemic. Gov't Exh. 10 and 009-3. IDES approved Hmaidan's PUA claim, and on June 8, 2020, she received her first PUA benefit payment which was loaded onto a debit card in her name. [47] Tr. 371:9-12; [50] Tr. 938:6-8. Two days later, on June 10, 2020, the first PUA claim in the name of someone not related to Hmaidan was filed with IDES as part of a fraudulent scheme. [50] Tr. 940:20-24. Between June 2020 and July 2021, an additional 678 PUA claims in the names of other people were filed with IDES. *Id.* at 941:3-5; *see also* Gov't Exh. 1700. 452 of these claims were filed using the same device that was used to file Hmaidan's own PUA claim. Gov't Exh. 1706. All of the 679 claims were tied to either Hmaidan's home on Cook Avenue, her brother A. Hmaidan's home on Long Avenue, or her sister Sara Hmaidan's home on 108th Place. [50] Tr. 940:3-16, 941:3-5; Gov't Exh. 1700. Specifically, 455 were linked to Hmaidan's

home, 61 were linked to her brother's home, and 158 were linked to her sister's home. Gov't Exh. 1700. Several of the claims were linked to both Hmaidan's home and her brother's or sister's home. Gov't Exh. 200.

IDES communicated with PUA claimants primarily through email. [47] Tr. 347:22-348:17, 349:7-16. FIS, the company responsible for managing the PUA debit cards, and Google produced roughly 50 emails to law enforcement concerning PUA claims tied to Hmaidan's, her brother's, and her sister's home addresses. [50] Tr. 969:1-10. In each of the emails, the sender directed FIS to update or change a claimant's address to Hmaidan or one of her sibling's home addresses and to send a new PUA debit card to one of their homes. *Id.* at 969:11-15. The emails were generally written in the first-person, as if the claimant was the sender and resided at Hmaidan or her siblings' home addresses. *See* Gov't Exh. 231, 222. Subscriber information for at least five of the email addresses identified on the PUA claims and used to communicate with FIS about mailing new debit cards contained information tying Hmaidan and her family members to the accounts. *See* Gov't Demonstrative K; *see also* [50] Tr. 955:8-962:18, 964:6-966:12. In addition to impersonating claimants by creating fake email accounts, Hmaidan also called FIS on at least two occasions and pretended to be claimants. [54] Tr. 1098:3-1099:11.

As a result of the PUA claims, a total of 953 debit cards containing PUA benefits were mailed out. Gov't Exh. 1703. 640 were tied to Hmaidan's home, 224 were tied to her sister's home, and 89 were tied to her brother's home. *Id.* After mailing, at least 289 of those debit cards were activated by phone numbers subscribed

to by Hmaidan and her family members. Gov't Exh. 1705. Phone numbers subscribed to by Hmaidan activated 187 cards, including 63 activated by a number that was used by Torres, Hmaidan's employee. Gov't Exh. 1608. In addition to cards that were activated using numbers subscribed to by Hmaidan, 45 cards were activated by her brother's phone number, 15 were activated by her sister's phone number, 29 were activated by her mother's phone number, and 11 were activated by her daughter's phone number. *Id.*; [40].

The debit cards issued as part of this scheme were used most often at nine banks located within five miles of Hmaidan and her siblings' homes. [50] Tr. 1043:10-21, 1044:14-22, 1045:21-1047:14. At those nine banks, between August 2020 and February 2023, the debit cards were used to make 2,745 separate cash withdrawals, amounting to $2.86 million. *Id.* at 1044:23-1045:1-5, 1049:21-1050:10. 45% of those withdrawals—regardless of claimant, which of Hmaidan or her siblings' addresses were tied to the claims, or whether Hmaidan, her family members, or Torres activated the card—were for the exact same amount, $1,403.50. *Id.* at 1053:5-10. Between September 2020 and January 2021, video cameras at some of these banks captured Hmaidan and her family members withdrawing more than $80,000 from debit cards that belonged to 58 different people, across roughly 90 transactions. Gov't Exh. 1704. On multiple occasions, Hmaidan and her family members were captured on video making cash withdrawals from multiple debit cards in different people's names on a single day. Gov't Exh. 1701.

Hmaidan and Torres used similar tactics to recruit claimants. Hmaidan discussed the potential for receiving government funds with Daniel Flores Navarro, Juan Ramos, and Travis Costello. [47] Tr. 505:11-509:2-14; [49] Tr. 614:12-615:6, 729:2-22. Torres had similar conversations with Charles Palmer and David Aguilar Garcia. [49] Tr. 680:10-682:1-5; [47] Tr. 557:19-558:25. Neither Hmaidan nor Torres told these claimants that they had to be unemployed because of the pandemic to be eligible for the funds. In fact, in one case, a potential claimant, Mr. Aguilar, told Torres that he did *not* want to apply for the benefits and nonetheless a PUA claim, linked to Hmaidan's address, was filed in his name, and the associated debit card was activated by Torres' phone. [47] Tr. 559:5-20; Gov't Exhs. 1700, 201, and 105. Mr. Aguilar's PUA debit card was used 27 times to withdraw $34,494 in cash. Gov't Exh. 1701. Mr. Aguilar did not receive any of that benefit money from Hmaidan or Torres. [47] Tr. 559:21-560:1.

After the government rested, Hmaidan's counsel moved for judgment of acquittal under Federal Rule of Criminal Procedure 29 and the Court denied that motion. [54] Tr. 1148:9-13. On May 12, 2026, a jury convicted Hmaidan on all six counts in the indictment. *Id.* at 1246:23-1247:10. Hmaidan now moves for a new trial under Federal Rule of Criminal Procedure 33 and renews her motion for judgment of acquittal under Rule 29. [66] [67]. The government also moves for entry of a forfeiture order. [64].

## DISCUSSION

### I. Motion for Judgment of Acquittal

Hmaidan renews her Rule 29 motion with respect to Count 1 of the indictment, conspiracy to commit mail fraud. [66] at 1. Hmaidan argues the government failed to prove that "Ms. Hmaidan actually reached any agreement with anyone else to engage in any illegal activity, including but not limited to mail fraud." *Id.* at 11.

A defendant may move for a judgment of acquittal on the basis that the evidence presented at trial was "insufficient to sustain a conviction." Fed. R. Crim. P. 29. A defendant faces "a nearly insurmountable hurdle" in contending that the jury had insufficient evidence to find her guilty. *See United States v. Miller*, 782 F.3d 793, 797 (7th Cir. 2015). The court must "afford great deference to jury verdicts, view the evidence in the light most favorable to the jury's verdict, and draw all reasonable inferences in the government's favor." *United States v. Brown*, 973 F.3d 667, 682 (7th Cir. 2020). The jury's verdict may be set aside "only if no rational trier of fact could have agreed with the jury." *Id.*

The trial evidence, taken as a whole, established an implicit agreement between Hmaidan and her co-conspirators to submit fraudulent unemployment claims to IDES and obtain financial benefits to which they were not entitled. *See United States v. Handlin*, 366 F.3d 584, 589 (7th Cir. 2004) ("An agreement need not be explicit; a tacit agreement may support a conspiracy conviction."); *see also United States v. Morales*, 145 F.4th 782 (7th Cir. 2025) ("Due to the secretive nature of conspiracies, the prosecution's case frequently will be 'based largely (and often, solely) on circumstantial evidence.'") (quoting *United States v. Page*, 123 F.4th 851, 861 (7th Cir. 2024). The evidence at trial, as described above, established that Hmaidan and

Torres worked together, communicated with one another, and took actions in furtherance of the fraudulent scheme. Mr. Aguilar's testimony supplied ample evidence that Torres had knowledge of the fraud. Aguilar told Torres that he did not want to receive PUA benefits and yet a claim was filed on his behalf anyways. Torres activated the PUA debit card that was issued in Aguilar's name and sent to Hmaidan's home address. Despite activating the card, Torres never provided it to Aguilar or otherwise gave him the benefit money. Instead, the card was used over 27 times to withdraw more than $34,000. In addition, both Hmaidan and Torres recruited other claimants by lying to them about key eligibility requirements. Those claimants all testified about similar conversations and experiences regardless of whether they interacted with Hmaidan or Torres. As such, it was reasonable for the jury to conclude that Hmaidan and Torres reached a tacit agreement to participate in this fraudulent scheme.

Moreover, the evidence related to Hmaidan's family members, including her brother and sister, was also sufficient to allow a reasonable jury to find they entered an agreement with Hmaidan to commit mail fraud. Between August 2020 and March 2022, more than 300 PUA debit cards were mailed to Hmaidan's siblings' homes, and more than 600 PUA debit cards were mailed to Hmaidan's home. On multiple occasions during this period, claimants' mailing addresses on file with FIS were even changed back and forth from Hmaidan's home to her siblings' homes. Once the debit cards arrived, they were activated by Hmaidan, her siblings, other family members, and Torres. Once the debit cards were activated, they were used in nearly identical

ways. Nearly half of the more than 2,700 cash withdrawals were at ATMs within five miles of their homes and were in the amount of $1,403. And, in some instances, the same cards were used repeatedly over only a few days to withdraw thousands of dollars. The evidence showed that Hmaidan and her siblings engaged in a series of repetitive transactions, followed a similar sequence of events, and had a prolonged, cooperative relationship with a common goal of obtaining financial benefits to which they were not entitled. Therefore, it was reasonable for the jury to infer that A. Hmaidan and S. Hmaidan were aware that the benefits were fraudulently obtained and nonetheless agreed to participate in the scheme with Hmaidan.

This Court may only overturn the verdict if "no rational trier of fact could have agreed with the jury." *Brown*, 973 F.3d at 682. It cannot do so. For these reasons, Hmaidan's motion for judgment of acquittal is denied.

## II. Motion for New Trial

Hmaidan also moves for a new trial pursuant to Federal Rule of Criminal Procedure 33. [67]. Rule 33 allows district courts to vacate a judgment and grant a new trial in the "interest of justice." Fed. R. Crim. P. 33. However, "[a] jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." *United States. v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994). The Seventh Circuit has made clear that there must be a "reasonable possibility that the trial error had a prejudicial effect on the jury's verdict" to warrant a new trial. *United States v. Flournoy*, 842 F.3d 524, 530 (7th Cir. 2016). Therefore, granting relief under

Rule 33 is "reserved for only the most extreme cases." *United States v. Coscia*, 4 F.4th 454, 465 (7th Cir. 2021).

First, Hmaidan argues that the Court improperly allowed the government to introduce co-conspirator statements at trial. [67] at 2-6. To support this argument, Hmaidan primarily relies on the arguments made in her Rule 29 motion, namely that the government "was wholly unable to establish that Ms. Hmaidan had any co-conspirators." *Id.* at 2. As discussed above, the evidence at trial established a conspiracy beyond a reasonable doubt, and therefore necessarily satisfied the lower preponderance of the evidence standard necessary for admission of co-conspirator statements under FRE 801(d)(2)(E) and *United States v. Santiago,* 582 F.2d 1128 (7th Cir. 1978). For the reasons outlined in response to Hmaidan's Rule 29 motion, this basis for a new trial is denied.

Second, Hmaidan argues the Court erred in granting the government's motion to admit Hmaidan's own PUA claim. [67] at 6-7. Before trial, the government moved to admit Hmaidan's personal PUA claim and the Court granted the motion over objection, finding Hmaidan's claim was admissible as direct evidence of the alleged conspiracy. [42] Tr. 17:15-19:3. Hmaidan argues that was in error where Hmaidan's PUA claim "did not constitute direct evidence of the conspiracy," particularly where "the Government wholly failed to establish, in the first instance, any conspiracy because it failed to present any evidence that Ms. Hmaidan agreed with anyone else to engage in any illegal act." [67] at 7. As established, the Court is not persuaded by Hmaidan's argument that there was no evidence of a conspiracy in this case.

Furthermore, the substantive mail fraud counts of the indictment required the government to prove that Hmaidan engaged in a scheme to defraud. Hmaidan's own PUA claim provided direct evidence of the scheme to defraud, because it demonstrated her fraudulent intent. For over a year, in connection with her personal PUA claim, Hmaidan certified to IDES that she was not working. The fact that she was disclaiming the filing of hundreds of PUA claims in her clients' names directly rebutted her defense at trial that she was filing PUA claims as part of her lawful business services. Moreover, Hmaidan's PUA claim was also direct evidence of the scheme to defraud because it was, itself, another fraudulent claim. Finally, as the Court noted in its ruling on the government's motion, the evidence was not improper propensity evidence and was instead probative of Hmaidan's identity and familial connections, her knowledge of the unemployment insurance program, her lack of mistake or accident in submitting the fraudulent claims, and her opportunity to commit the crime. *See* [42] Tr. 17:15-23. For these reasons, this basis for a new trial is also rejected.

Finally, Hmaidan argues the Court erred in allowing Mr. Ramos to provide foundationless hearsay testimony. [67] at 7-8. Specifically, Hmaidan argues that Ramos was permitted to testify "about his alleged interactions with someone allegedly connected to Ms. Hmaidan and her tax business, even though he (and the Government) were wholly unable to lay any foundation as to the identity of that individual." *Id.* at 7. Count six of the indictment charged Hmaidan with a substantive count of mail fraud based on the mailing of a PUA debit card in Mr. Ramos' name. [1]

at ¶ 16. Ramos testified that before the COVID-19 pandemic he began using a woman tax preparer who worked out of the Super Mall. [49] Tr. 725:7-726:8. Ramos testified that this woman wore a black head covering. *Id.* at 727:16-728:17. Ramos testified that he spoke with this woman after the pandemic started about "some money that was going to come in." *Id.* at 726:16-727:2. According to Ramos, this conversation occurred over the phone while he and the woman were working on his taxes. *Id.* at 728:18-729:1. When the government asked Ramos what his tax preparer told him about the money, defense counsel objected on hearsay and foundation grounds. *Id.* at 729:2-5. The Court overruled the objection. *Id.* Later, Ramos testified that he picked up the money, in the form of a card that was already activated, from his tax preparer's house in Oak Lawn. *Id.* at 731:4-732:15.

The testimony Ramos provided was sufficient to establish foundation. Although he could not remember his tax preparer's name, he described her as a woman who worked at the Super Mall, wore a head covering, and had a conversation with him about additional money while they were doing his taxes after the pandemic began. This testimony was sufficient to establish that he was having a conversation with Hmaidan. For these reasons, Hmaidan's motion for a new trial is denied.

**III. Forfeiture**

The government moves for entry of a forfeiture order pursuant to 18 U.S.C. §§ 981(a)(1)(C), 1956(c)(7)(A), and 1961(1), 28 U.S.C. § 2461(c), and Federal Rule of Criminal Procedure 32.2. [64] at 1. *See United States v. Silvious*, 512 F.3d 364, 369-70 (7th Cir. 2008) (affirming forfeiture order following mail fraud conviction and

explaining that 28 U.S.C. § 2461(c) "authorizes criminal forfeiture of the proceeds of any offense for which there is no specific statutory basis for criminal forfeiture as long as civil forfeiture, *see* 18 U.S.C. § 981, is permitted in connection with that offense"). Specifically, the government is asking the Court to order Hmaidan to pay judgment in the amount of $1,965,712. Though no written response was filed, the government indicates Hmaidan opposes the motion. [64] at 1; *see also* [65].

Rule 32.2(b)(1)(A) requires that as "soon as practical after a verdict or finding of guilty . . . on any count in an indictment or information regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute." "If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense." *Id.* "If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay." *Id.* "The court's determination may be based on evidence already in the record, . . . and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B).

Forfeiture is "gain-based, focusing on the defendant's proceeds from the criminal activity." *United States v. Bogdanov*, 863 F.3d 630, 633 (7th Cir. 2017). "In order to meet its burden, the Government must establish a nexus between the property seeking to be forfeited and the offense." *United States v. Del Guidice*, 594 F. Supp. 3d 998, 1002 (N.D. Ill. 2022). Because asset forfeiture is considered punishment

and is a part of the sentencing process, the government bears the burden of proving that property is subject to forfeiture by a preponderance of the evidence. *United States v. Smith,* 770 F.3d 628, 637 (7th Cir. 2014). "The calculation of forfeiture amounts should be a reasonable estimate but need not be precise." *Del Guidice*, 594 F. Supp. 3d at 1004. Here, the government has established by a preponderance of the evidence that it is entitled to a forfeiture judgment in the amount of $1,965,712.

At trial, the government presented evidence that over nearly two years Hmaidan submitted hundreds of fraudulent PUA claims in other peoples' names, and as a result, IDES distributed more than $11 million in unemployment insurance benefits. Hmaidan and her family members pocketed at least $2,868,797 of those distributions. *See* Gov't Exh. 1701 (PUA debit card withdrawals). Hundreds of debit cards were sent to Hmaidan's home and were used to withdraw at least $1,965,712. *Id*. This evidence is sufficient to demonstrate a nexus between the offenses of conviction and proceeds in the amount of $1,965,712, thereby justifying forfeiture.

The government reports that, despite the due diligence of law enforcement, it has been unable to locate all property subject to forfeiture, particularly where Hmaidan may have used cash proceeds to purchase consumables; may have transferred, sold, or deposited such property with a third party; or may have commingled tainted and untainted property. [64] at 5. Where a defendant has not preserved all property subject to forfeiture, the Court is required by 21 U.S.C. § 853(p)(2) to forfeit "any other property of the defendant." Accordingly, the Court orders forfeiture of any other property belonging to Hmaidan up to the value of

$1,965,712, in order to satisfy this judgment. The government is also permitted to conduct discovery to identify or locate property that may be forfeited to satisfy this order.

## CONCLUSION

For the reasons stated herein, Hmaidan's motion for judgment of acquittal [66] and motion for new trial [67] are denied. The government's motion for entry of forfeiture order [64] is granted.

E N T E R:

Dated: October 2, 2026

MARY M. ROWLAND
United States District Judge